169 So. 273

### SCOTT et al. v. ALABAMA STATE BRIDGE CORPORATION.

#### 3 Div. 183.

Supreme Court of Alabama.

June 25, 1936.

Rehearing Denied July 16, 1936

ton, Crenshaw & Rushton, Steiner, Crum & Weil, Thos. B. Hill, Jr., and Wm. Inge Hill, all of Montgomery, for appellants.

Lawrence H. Lee, of Montgomery, for appellee.

A. A. Carmichael, Atty. Gen., Thos. Seay Lawson, Asst. Atty. Gen., and Rush-

BOULDIN, Justice (after stating the case as above).

Declaratory judgments and decrees are to be reviewed on appeal as other judgments and decrees. Uniform Declaratory Judgment Act, § 7 (Gen.Acts 1935, p. 778).

Among the questions for consideration is that of jurisdiction in the trial court, as a basis for the jurisdiction by this court on appeal. This court takes notice of the question of jurisdiction ex mero motu.

Upon consideration, we are of opinion that the record presents justiciable issues within the meaning of the Uniform Declaratory Judgment Act.

Controversies touching the legality of the acts of public officials, or public agencies, challenged by parties whose interests are adversely affected, is one of the favored fields for such declaratory judgment, styled in the act and in the authorities, the "declaration." Official action, done or threatened, challenged as unlawful, a usurpation of official power, whether lack of authority appears in the terms of the statutes, or because of unconstitutionality thereof, are said to be determinable in this manner rather than force the parties to seek injunctive relief, which involves many questions going to the propriety of such relief.

When justiciable issues between proper parties are duly presented under this statute, the inquiry goes direct to the merits of the controversy. Section 2 of the act expressly extends to persons "whose rights, status or other legal relations are affected by a statute"; the determination to cover "any question of construction or validity" of the statute. General Acts 1935, p. 778.

In all cases an actual controversy must appear in which the parties to the proceeding are interested. Jefferson County v. Johnson (Ala.Sup.) 168 So. 450;[1] United States Fidelity & Guaranty Co. v. Hearn et al., post, p. 31, 170 So. 59; Borchard on Declaratory Judgments, pages 111, 167 to 171.

Proceeding to consider alleged errors assigned and argued in appellants' brief, we deal first with the insistence of bondholders that there was error in subdivision VII of the decree.

It is argued that under section 7 of the Act of 1935 [General Acts 1935, pp. 602, 604], the authority to make the lease contemplated in the act cannot be exercised until all the outstanding bonds have been refunded or renewed with the consent of the holder thereof at a rate of interest not exceeding 4 per cent.

Section 7 is quite general, prescribes no details touching refunding operations, and must be construed in the light of the history and purpose of the act and general principles of law and equity governing such matters.

The construction and maintenance of a system of public roads and bridges, free to public use, is a well-settled policy of this state, expressed in the first amendment to our present Constitution, and two subsequent amendments, amendment 11, art. 20, and amendment 14, art. 20A. These latter amendments expressly authorize appropriations to this end, and recognize the state highway department, as the state agency, in such enterprise.

The act of 1927 (General Acts 1927, p. 278), looking to the construction of a system of toll bridges, and creating the Alabama State Bridge Corporation, a state agency, for the purposes and with the powers defined in the act; was passed at the same session that amendment 14, art. 20A, was proposed.

That the Legislature has plenary power to pass laws looking to the incorporation of these bridges into the general highway system free of tolls, is undoubted. The measures to this end, must, as of course, not run counter to constitutional inhibitions forbidding the impairment of contracts, nor the creation of a debt within the meaning of section 213 of the Constitution. Such is the major purpose of the act of 1935, under which the proceedings in question are undertaken.

The refunding provisions of section 7 (Gen.Acts 1935, p. 604) have two major ends in view; the consent of holders of existing bonds to the substitution of the security, $300,000.00 per annum, for the existing security behind their present bonds, and the lowering of the interest rate.

It must be assumed the Legislature had full knowledge of the subject-matter of legislation. The wide discretion vested in the

public authorities in prescribing the form of refunding or renewal bonds and the period they should run, within the 30-year limit prescribed, was evidently with the view of making sure that the fixed sum of $300,000 per annum would be sufficient and make certain the amortization and payment of the entire obligation as stipulated in refunding operations. The act proceeds on the assumption that the new security proposed would be acceptable to existing bondholders in view of the status of existing security, which should be viewed in the light of the original contract, the mutual covenants therein, and all legislation entering into and limiting the same.

The ends aimed at must enter into the inquiry whether the entire matter must await the consent of every existing bondholder.

It appears there are outstanding 3,780 original bonds, payable to bearer, besides interest coupons, each payable to bearer; that the ownership of all of these securities is practically unascertainable, and may change from day to day.

If, as insisted, the refunding operations must await the assent of every bondholder, including those holding unmatured bonds, as to which there is no provision for payment in advance of maturity, the legislation becomes virtually an idle gesture.

Principles of law and equity generally recognized touching refunding operations on a large scale by corporations of a public character should be applied. These principles recognize mutuality of rights among such bondholders. The majority have rights and equities as well as the minority. Where the existing security consists in much of returns from a going concern, the common interests of bondholders as well as the public are to be considered.

Where, as here, there exists mutual covenants giving a stated majority the controlling voice in working out the common interests in the security, such covenants are not to be ignored.

Without going into detail, the general principles mentioned are considered in the following authorities, and others therein cited: Shaw v. Little Rock & Ft. Smith Railroad Company, 100 U.S. 605, 611, 612, 25 L.Ed. 757; Gates v. Boston & N. Y. Air-Line R. Co., 53 Conn. 333, 5 A. 695, 701; Jameson et al. v. Guaranty Trust Co. of New York et al. (C.C.A.) 20 F.(2d) 808; Note 28 A.L.R. 1196; Note 88 A.L.R. 1241.

It is not sought here, as in some reorganization cases, to require nonconsenting bondholders to accept the refunding bonds in lieu of the old. The proposal is to issue refunding bonds only to assenting bondholders. Unknown or nonassenting bondholders are to retain their original bonds. It is proposed to free the bridges from tolls in the public interest. To accomplish this end, the due protection of holders of original bonds does require that provision for their payment out of existing funds, agreed to be in hand sufficient to meet past due interest, and the gross annual fund under the lease shall equal the security they now have. In equity they could not demand more. If in the refunding operations their rights are so safeguarded, and thereafter, the arrangement is faithfully executed, for which ample remedies will be available, there can arise no occasion for resorting to original sources of payment.

Our conclusion is the proposed proceedings under the act need not await the consent of all bondholders, and that, under the facts of the case, the decree fixing 76 per cent. or more, as the majority whose consent will be sufficient to put the leasing feature of the act into effect, is due to be affirmed.

The intervening bondholders, also the Attorney General, on behalf of the state, challenge subdivision IV of the declaration, saying: "The making of the proposed lease, and the obligations therein to be assumed by the State Highway Department or Commission, would not create a debt against the State in violation of section 213 of the Constitution of Alabama as amended."

This insistence presents the most vital objection, we may say the only remaining substantial objection to the act of 1935, and proposed proceedings thereunder.

In April, 1927, the amendment to the Constitution (amendment 14, art. 20A) was adopted by the electors of the state. This amendment looked to an issue of $25,000,000 state bonds for the construction, repair, and maintenance of roads and bridges. In this amendment was a mandatory provision as follows: "To create a sinking fund for the prompt and faithful payment of the principal and the interest on these bonds and for the construction, maintenance and improvement of such public highways, roads and bridges, the Legislature shall levy an excise tax, in addition to the levy made February 10, 1923, of two cents per gallon upon gasoline or any sub-

stitute therefor, or an adequate license or excise tax on any other motive power used to propel auto vehicles." Code 1928, p. 92.

Accordingly, the Legislature did, on January 25, 1927, pending the adoption of said amendment, pass an act levying the excise tax on motor fuels of 2 cents per gallon. General Acts 1927, p. 16.

By section 10 of said act (page 18) the proceeds of said levy were pledged to the payment of interest and principal of the bonds to be issued under said amendment in sufficient sums to retire the bonds within a period of 31 years.

By the same act the surplus of such funds was devoted to construction and maintenance of roads and bridges "in accordance with the law as it now exists or may hereafter be enacted." Gen.Acts 1927, p. 19, § 10.

Then followed, August 31, 1927, the Alabama State Bridge Corporation Act, through which these toll bridges were erected and bonds issued. General Acts 1927, p. 278. This act takes notice of the recent constitutional amendment, and the gasoline tax levied pursuant to its mandate. Speaking of the bonds of the Bridge Corporation, the act says: "The interest on said bonds may be paid out of the residue of the receipts from gasoline tax collected by the State under the Excise Gas Tax Act approved January 25, 1927, and known as the Gasoline Tax Act after there has been taken from that fund the amount necessary to meet all of the primary purposes to which said gas tax fund is pledged under Article XXA as an Amendment to the Constitution of the State, and as provided for in Section 10 of the Act approved January 25, 1927. * * * Such an amount of money as may be necessary to pay the interest herein provided for is hereby appropriated out of any monies in said funds not otherwise appropriated." Gen.Acts 1927, pp. 280, 281, § 1.

The constitutionality of this statute, and of these provisions, with direct reference to section 213 of the Constitution, was fully considered in Alabama State Bridge Corporation et al. v. Smith, 217 Ala. 311, 116 So. 695. A reading of page 316 of that opinion in 217 Ala., 116 So. 695, leaves no doubt that this surplus fund, arising from a continuing levy, was definitely pledged to the payment of the accruing interest on these Bridge Corporation bonds. Just as definitely it was declared that the faith and credit of the state not being pledged or bound to pay in all events, and no state guaranty being given, that the surplus funds so pledged would be sufficient, the bonds do not constitute a debt within the meaning of section 213. This was a test case before the bonds were issued, and became the law of the contract when they were issued under the well-known doctrine of stare decisis. In re Opinions of the Justices, 225 Ala. 460, 143 So. 900.

Again in Re Opinions of the Justices, 230 Ala. 673, 163 So. 105, this court held that securities issued by counties to borrow money and running for 20 years, not to be a charge on the general revenues, nor on funds arising from levies for special county purposes, but payable only from the 2-cent gasoline tax fund collected by the state and allocated to the counties, are not "debts" within the meaning of section 224 of the Constitution.

Like decisions as to city securities are found in Oppenheim v. City of Florence et al., 229 Ala. 50, 155 So. 859; Smith v. Town of Guin et al., 229 Ala. 61, 155 So. 865.

Our decisions touching proposals looking to the funding of the state floating debt, so-called, but in fact invalid, because incurred in violation of the Constitution and necessitating a validating constitutional amendment, are clearly based on different principles.

That a continuing obligation, payable from special excise taxes, not to be a charge on the general revenues, nor pledging the faith and credit of the state, is not a debt within the meaning of constitutional provisions similar to ours, is the current of authority in other states. See note to 100 A. L.R. page 900 et seq.

So the situation is this: Here is a fund arising from the levy of an excise tax under constitutional mandate. This fund, after payment of the first charge thereon, has from the beginning been pledged to the payment of the interest on these Bridge Corporation bonds. It is a continuing levy, running for the life of the road bonds, viz., to the end of the fiscal year 1958–1959.

That this surplus fund coming into the control of the state highway commission is and will be sufficient, indeed many times sufficient, to meet the annual rental of $300,000 under the act of 1935, is not questioned. Counsel for appellant bondholders say this surplus runs more than a million dollars per annum. Looking to official records, we find highway department receipts

from this gasoline excise tax for the fiscal year ending September 30, 1935, were $4,008,140.62. Report State Comptroller (fiscal year ending September 30th, 1935) page 31.

The debt service requirements, first charge on such funds, is shown on page 55 of the same report.

The highest annual charge to meet principal and interest on the second issue of highway bonds is $1,546,972.50, which gradually declines to $1,227,375.00 for 1958–1959, when said highway bonds will all be retired.

We need not inquire whether the highway commission may lawfully pay this annual rental of $300,000 from other funds which, from year to year, may come under the control of that department. The law would allocate to the payment of such rental this fund from which it may lawfully be paid.

No one insists, nor could it be plausibly insisted, that this fund may be lawfully pledged to meet a continuing interest charge on these Bridge Corporation bonds, without incurring a debt, but that a further pledge of such fund to amortize the principal of the same obligations, and so reduce and end the payment of interest, would incur a debt.

That the same measures may be taken under legislative authority to pay renewal or refunding bonds which apply to the original obligations is also clear.

But it is insisted a debt is created under the act of 1935, because, as lessee, the highway commission is required to maintain the bridges, and reconstruct, if necessary.

These bridges are on state highways, so stated in the original bridge act. When coming under control of the highway department, the duty to maintain or reconstruct same is referable to the general law, just as other bridges on our highways. This stipulation to perform such duty implies that it will be done from funds available, without the incurring of a debt within the meaning of section 213.

The act of 1935 does not contemplate the creation of a debt against the state, and is not violative of section 213 of the Constitution.

The proposed plan of carrying out such act is not subject to such constitutional objection.

It follows the decree appealed from is not subject to the objections raised on appeal, and said decree should be and is hereby in all things affirmed.

Affirmed.

All the Justices concur, except THOMAS and BROWN, JJ., not sitting.

THOMAS, Justice.

Being the owner and holder, with others, of the legal title in trust to some of the bonds, the subject of this litigation, I hereby declare myself disqualified, and take no part in this decision.